**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | Case No.  2:15-cr-00011-JCM-CWH |
| vs. | ) ) | **REPORT AND** |
| JEROME MICHAEL BELL; DESHAWN WALKER, | ) ) ) | **RECOMMENDATION** |
| Defendants. | ) ) ) | |

This matter is before the Court on Defendant Deshawn Walker's ("Walker") Motion to Suppress Evidence (#24), filed on May 1, 2015.  The Government filed a Response (#28), filed on May 15, 2015.  Walker filed a Reply (#33) on May 20, 2015.  The Court conducted an evidentiary hearing on June 15, 2015.  (Mins. of Proceedings (#40).)

**FACTUAL BACKGROUND**

On January 02, 2015, at about 8:44 a.m., two men entered the Town & Country Bank at 10200 West Charleston, Las Vegas, Nevada.  FBI Agent James Mollica testified he learned that the bank robbery was committed by two black males.  He received surveillance pictures from the bank that showed two suspects.  One of the suspects was wearing a white hockey mask and the other was wearing a red bandana.  Both suspects were wearing dark pants, dark sweatshirts with hoods, and black shoes with white soles.  The suspects took money, which included an electronic tracking device.

Officers from the Las Vegas Metropolitan Police Department followed the signal from the tracking device to a lime colored Kia Soul automobile carrying two black males.  Officers pursued the Kia, and it eventually crashed into another vehicle at the intersection of Searles and Bruce Streets in Las Vegas.  Defendant Jerome Bell was apprehended at the scene of the crash, but the other individual

1   in the vehicle was not located.  Neither the money nor the electronic tracker were in the Kia, but the

2   electronic tracking device was still showing movement in the vicinity.  The police therefore set up a

3   perimeter to contain the second suspect.  Nearby residents began calling police dispatch to report a

4   black male moving through the neighborhood and jumping walls.  At least one caller reported the black

5   male was wearing a brown and white striped shirt and carrying a backpack.

6        Officer John Jenkins, a police officer who patrols with working dogs of the K-9 unit, arrived

7   in the area where other Metro officers had formed a perimeter, and he participated in the search for the

8   second suspect with his working dog.  Officer Jenkins entered the backyard of a home on East Ryan

9   Avenue and came upon a small shed with its door open. The working dog entered the shed and bit

10  Walker, who was hiding behind a large bag in the shed.  Officer Jenkins ordered Walker to show his

11  hands, and when he failed to do so, Officer Jenkins pulled on the dog's leash and subsequently pulled

12  both the dog and Walker out of the shed.  Officer Jenkins noted that Walker's clothing matched the

13  description of the clothing of the individual reported by dispatch, that is, a brown and white striped

14  shirt.  Walker was placed in handcuffs and detained by a backup officer.

15       Agent Mollica testified that when he arrived at the scene of the Kia crash, he noticed a white

16  hockey mask and a red bandana in the vehicle.  Agent Mollica then drove to the location where Walker

17  was placed in custody, which was six to eight blocks and less than five minutes drive from the crash

18  site.  Agent Mollica received by cell phone a copy of a surveillance photo of the robbers taken at the

19  bank.  Agent Mollica learned that the property owner of the shed where Walker was detained did not

20  know Walker and that he had no reason to be in the shed.  After Agent Mollica notified Walker that

21  he was being arrested for bank robbery, Walker made  incriminating statements to Agent Mollica.[1]

22  After being cleared by medical personnel, Walker was transported to an FBI satellite office where he

23  provided a statement to agents after he was read his *Miranda* rights.  Despite searching the area where

24  Walker was arrested, police did not recover the money or backpack.

25

26       [1] Walker was not read his *Miranda* rights before making these statements.  The
    Government indicated that it would not use these statements in its case in chief.  (Resp. at 4.)
27  The Court therefore will not use these statements for any purpose in addressing Walker's Motion
28  to Suppress.

1

## ANALYSIS

2 Walker moves to suppress the incriminatory statements made during interrogation at the FBI

3 satellite office on January 2, 2015, and all other items seized as evidence as the "fruit of the poisonous

4 tree." Walker argues that he was arrested without an arrest warrant or probable cause to believe he had

5 committed a crime, and that the result of his unlawful arrest was an incriminating statement. He argues

6 that the subsequent *Miranda* warnings which were administered at the FBI offices did not cure this

7 unlawful arrest. The government responds that there was probable cause to believe Walker committed

8 the crime for which he was arrested, and therefore the evidence should not be suppressed. At the

9 hearing, the parties agreed that the single issue for resolution was whether there was probable cause

10 for Walker's arrest.

11 The Fourth Amendment addresses "the right of the people to be secure in their persons, houses,

12 papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth

13 Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389

14 U.S. 347, 352 (1967). Specifically, it "protects people, not places." *Id*. at 351. Evidence obtained

15 in violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit

16 of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

17 "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor

18 committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported

19 by probable cause." *Maryland v. Pringle*, 540 US 366, 370 (2003); *see also Atwater v. Lago Vista*, 532

20 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed

21 even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment,

22 arrest the offender."). "Probable cause exists when, under the totality of the circumstances known to

23 the arresting officers, a prudent person would have concluded that there was a fair probability that [the

24 suspect] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999)

25 (quotation omitted). The information on which officers rely in forming their conclusions regarding

26 probable cause must be "reasonably trustworthy." *United States v. Butler*, 74 F.3d 916, 920 (9th Cir.

27 1996) (quotation omitted). Arresting officers may rely on the probable cause developed by other

28 officers. *United States v. Hensley,* 469 U.S. 221, 229-32 (1985). Absent probable cause, a warrantless

3

1    arrest is illegal. *Buckner*, 179 F.3d at 837.

2         Here, a bank robbery occurred in the morning of January 2, 2015, and the perpetrators were

3    identified as black men wearing dark clothing.   Police officers detected the tracking device in the Kia

4    occupied by two black males, and gave chase.  Shortly thereafter, the Kia crashed into another vehicle.

5    By the time the officers arrived at the scene of the crash, the tracking device and one of the two men

6    had departed.  Because the mask and bandana were found in the car, and the tracking device was

7    detected, it was likely that the individuals in the vehicle were involved in the robbery.  Further, it was

8    likely that the individual who had departed the location of the crash was nearby.

9         At about the same time, residents in the neighborhood of the crash, apparently witnessing

10   something out of the ordinary, called Metro dispatch to report that a person was seen jumping over

11   fences and into backyards, and he was wearing a brown and white striped shirt.  Walker, a black man,

12   was found within six to eight blocks of the scene of the crash.  He was wearing dark pants, as were the

13   robbers.  He wore a brown and white striped shirt, the same as the person reportedly jumping fences

14   in the neighborhood.  Comparison of Government Exhibits 2 and 3 reveals that Walker was wearing

15   black shoes with white soles, similar to the shoes worn by the robbers depicted in the surveillance

16   photo.  At mid-morning, Walker was found hiding in a shed in the backyard of a resident who knew

17   nothing about Walker.  Although it was January 2, reportedly a cool day, Walker wore no jacket,

18   suggesting he had shed his jacket to avoid association with the robbery.

19        Walker accurately points out that there are no witnesses who saw him leave the scene of the

20   crash, that the surveillance photograph provides no information about the hair, facial features, and

21   height of the robbery suspects, and that the color of pants seen in the surveillance photo and the color

22   of pants worn by Walker when he was arrested do not appear to be the same.  Finally, the backpack that

23   supposedly contained the money and tracking device never was found.  These uncertainties are

24   insufficient, however, to negate the showing of probable cause.  Based upon the totality of the facts

25   available, the Court finds that a prudent person would conclude that there was a fair probability, and

26   therefore probable cause,  that Walker committed the robbery.  Accordingly, the motion to suppress

27   the statements that Walker made on January 2, 2015, at the FBI satellite headquarters, and other

28   derivative evidence is denied.

**RECOMMENDATION**

   **IT IS THEREFORE RECOMMENDED** that Defendant Deshawn Walker's Motion to Suppress Evidence for Fourth Amendment Violation (#24) be **DENIED.**

**NOTICE**

   This Report and Recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this Report and Recommendation may file a written objection supported by points and authorities within fourteen days of being served with this Report and Recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the District Court's Order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).


   DATED: August 5, 2015.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**